**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DEBBIE L. ESKEW,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 08 C 1978** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Judge Sheila Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Debbie L. Eskew seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416, 423(d), 1381a. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. On April 26, 2010, the case was reassigned to this Court for all further proceedings. After careful review of the record, the Court now grants Defendant's motion for summary judgment and denies Plaintiff's motion.

## PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on March 9, 2006, alleging that she became disabled on March 4, 2005 from chronic obstructive pulmonary disease ("COPD"), emphysema, cataracts and diabetes. (R. 97-106, 122.) The applications were denied initially on September 1, 2006, and again on reconsideration on December 29, 2006. (R. 49-52, 59-66.) Pursuant to Plaintiff's timely request, Administrative Law Judge ("ALJ") James Grumay held an administrative hearing on July 18, 2007. The ALJ heard testimony

from Plaintiff, who appeared with counsel, and from vocational expert ("VE") Jefferson.[1]

Approximately two weeks later, on August 2, 2007, ALJ E. James Gildea found that Plaintiff is not disabled because she is capable of performing a significant number of light jobs that meet her functional restrictions.[2] (R. 12-21.) The Appeals Council denied Plaintiff's request for review on February 6, 2008, and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. (R. 2-4.)

In support of her request for a reversal and/or remand, Plaintiff argues: (1) the ALJ improperly found that her diabetes and cataracts are not severe impairments, and failed to assess the severity of several additional impairments; (2) the ALJ erred in finding that she does not meet Listing 3.02A for chronic pulmonary insufficiency; (3) the ALJ's credibility and RFC determinations were flawed; and (4) the ALJ erred in accepting the testimony of the VE. For reasons discussed below, the Court rejects these arguments.

## FACTUAL BACKGROUND

Plaintiff was born on September 15, 1956, and was 50 years old at the time of the ALJ's decision. (R. 117.) She has a high school diploma and her past relevant work includes bartender, industrial truck operator, assembly/machine tender, industrial x-ray operator, and supervisor for plastics fabrication. (R. 123, 193.)

---

[1]      The record does not provide a first name for Mr. Jefferson. (R. 41-46.)

[2]      It is not clear from the record why ALJ Grumay conducted the hearing, which ALJ Gildea had scheduled and arranged. (R. 76-77.)

## A.    Medical History

### 1.    2004 through 2005

The first available medical record dates to August 31, 2004, when Plaintiff reported to the Valley West Community Hospital Emergency Room ("Valley West ER") in Sandwich, Illinois, complaining of a cough, chest discomfort and shortness of breath that had gotten progressively worse over the previous two weeks.  (R. 267-68.)  A chest x-ray showed mild hyperinflation of both lung fields but was otherwise normal.  (R. 281.)  Dr. Joseph L. Mastro diagnosed acute asthma exacerbation, atypical chest pain, and ventricular ectopy,[3] and admitted Plaintiff for further testing.  (R. 267-68, 269-80.)  She was discharged the following day with a warning that she "must stop smoking!"  The doctor gave her Albuterol and Prednisone for her breathing, Elavil for depression, and Keflex for her respiratory infection.  (R. 272.)

Plaintiff returned to the Valley West ER on March 3, 2005, complaining of a cough. She reported having chest pain for a week, along with fevers, chills and occasional nausea.  (R. 258.)  A chest x-ray showed COPD, and Dr. Richard T. Arriviello diagnosed acute influenza and acute exacerbation of emphysema.  Following treatment, Plaintiff was feeling much better, with cleared lungs and no more wheezing.  Dr. Arriviello instructed Plaintiff to continue taking Albuterol, Atrovent, Pulmicort and a five-day course of Prednisone to help with her breathing.  He also gave her smoking cessation materials and told her "[n]o smoking."  (R. 259.)

---

[3]    Ventricular ectopy is "an extra heart-beat originating in the lower chamber of the heart."  The extra beats "are common and do not indicate a problem in people without heart disease." (http://medical-dictionary.thefreedictionary.com/Ventricular+Ectopic+Beats, last viewed on October 18, 2010).

Two days later, on March 5, 2005, Plaintiff saw Dr. Bern G. Binger at the Valley West ER. She stated that she "can't breathe" even after using her home nebulizer approximately 10 times, and reported that she could not afford to fill her prescriptions for Atrovent, Pulmicort or Prednisone. (R. 260, 264.) Plaintiff told Dr. Bern that she "possibly" had diabetes, and said that she had stopped smoking the previous day. (R. 260.) A chest x-ray read as clear with "[v]ery minimal new patchy infiltrate [fluid-filled area] in the right lower lobe" and "small actelectasis [collapse] in the left lower lung base." (R. 244, 261.) A chest CT scan exhibited no evidence of pulmonary embolism, but revealed chronic COPD with "bullous emphysema . . . in both lungs" and minimal patchy infiltrate. (R. 245, 261.) An ECG showed normal sinus rhythm with bigeminy[4] and no acute changes. Dr. Binger diagnosed acute bilateral pneumonia, dehydration and chronic bigeminy, and admitted Plaintiff for further care. (R. 261.)

Plaintiff was discharged from Valley West on March 7, 2005, with prescriptions for Vicodin and Albuterol. Dr. Martin P. Brauweiler advised Plaintiff to stop smoking and to follow up with him in four days at the Sandwich Medical Clinic. (R. 264.) At the March 11, 2005 follow-up appointment, Plaintiff complained of blurred/double vision for the past day and stated that she had stopped smoking. Dr. Brauweiler confirmed his assessment of asthma exacerbation and COPD, and instructed Plaintiff to return in one month. (R. 241.)

In both April and May 2005, Plaintiff contacted Dr. Brauweiler because she was applying for unemployment insurance and she wanted a note indicating that she had been able to work since March 7, 2005. (R. 240.) On May 21, 2005, Dr. Brauweiler gave

---

[4]     Bigeminy is "the occurrence of two beats of the pulse in rapid succession." (http://medical-dictionary.thefreedictionary.com/bigeminy, last viewed on October 19, 2010).

Plaintiff a note stating that she "can look for work (since 3/7/05). Because of COPD, she should not be around smoke or do heavy lifting (>20 [lbs.]) at a new job." (R. 242.)

### 2. 2006 through 2007

Plaintiff next reported to the Valley West ER on January 23, 2006, due to chest pain. She told Dr. Chad W. Yarman that she was not taking Albuterol or using her inhalers at that time because her COPD had been "okay." (R. 253.) Dr. Yarman found Plaintiff to have normal range of motion in all of her extremities and remarked that she was in no respiratory distress. (R. 253-54.) He diagnosed lip abrasions (which Plaintiff refused to discuss) and chest pain, and admitted her for further observation. (R. 254.) Dr. Eric J. Janota took over Plaintiff's care and noted that she was "a smoker" who occasionally smoked marijuana as well. Plaintiff told Dr. Janota that she felt overwhelmed and depressed, experienced poor sleep, and had difficulties with her husband and finances. Dr. Janota assessed asthmatic bronchitis, COPD, chest pain thought to be musculoskeletal in origin, depression, and drug and tobacco abuse. (R. 256-57.) He administered nebulizer treatments, Bactrim (an antibiotic) and Prednisone, and referred Plaintiff to social services for help with her financial problems. (R. 257.)

Dr. Janota discharged Plaintiff on January 25, 2006. He noted that a CT scan of her chest showed an ill-defined upper lobe consolidation on the right, which he treated with antibiotics. An ultrasound Doppler of Plaintiff's lower extremities revealed no appreciable swelling and was negative for deep vein thrombosis on both sides. Plaintiff received Prednisone, Bactrim, Albuterol and Advair, plus Xanax and Zoloft for depression/anxiety and "appropriate services to obtain the medications as an outpatient and to continue with

them." Dr. Janota "strongly encouraged" Plaintiff to follow-up with him in 10 to 14 days to repeat her CT scan. (R. 255.)

There is no evidence in the record that Plaintiff saw Dr. Janota again as recommended, but on March 8, 2006, she went to the emergency room at the Community Hospital of Ottawa ("Ottawa Hospital") complaining of shortness of breath, nausea, diarrhea and dehydration. A chest x-ray showed no infiltrates or effusions but "some flattening of the diaphragm suggesting early COPD." (R. 228.) The x-ray also revealed "focal right upper lobe opacity worrisome for neoplasm or potentially focal pneumonic infiltrate." The radiologist recommended a chest CT scan for further evaluation. (R. 234.) Dr. James Grueskin noted that Plaintiff "clearly needs her medications," and he "strongly encouraged her to followup with the free clinic in town if she is unable to get her prescriptions filled." He found no evidence of dehydration or pneumonia and saw no reason to administer antibiotics or admit Plaintiff for further treatment. Dr. Grueskin diagnosed COPD exacerbation and gave Plaintiff an inhaler and a dose of Solu-Medrol (a steroid). (R. 229.)

Six days later, on March 14, 2006, Plaintiff returned to Ottawa Hospital for a CT scan of her chest. The scan showed: "noncalcified ill-defined soft tissue density mass in the right upper lung lobe," which could either be a primary neoplasm (abnormal tissue mass) or area of scarring; a 15 millimeter right plumonary hilar lymph node; multiple small hypodense lesions in both lobes of the liver, which could either be benign liver cysts or metastatic deposits; and COPD with "bullous changes at both lung apices." (R. 221-22.) Both lungs were overinflated, but there was no pleural effusion or pneumothorax. (R. 221.) On a consent form for the CT scan, Plaintiff denied having diabetes or asthma. (R. 224.)

On May 31, 2006, Plaintiff went to the Ottawa Hospital ER complaining of chest pain, shortness of breath and weight loss. She exhibited a "fairly significant cough" and reported feeling worried about the recent diagnosis of an intrathoracic mass. (R. 210.) A chest x-ray showed no significant change compared to the previous exam in March, but the lungs were hyperexpanded and there was a suggestion of a mass in the right upper lobe. (R. 210-11, 218.) Dr. Grueskin diagnosed reflux esophagitis and instructed Plaintiff to take Prevacid daily. (R. 211, 219.) Plaintiff was anxious, frustrated and tearful while waiting for a ride home and she spoke with Shirley Goodwin from social services to help her identify available resources. (R. 214.) Plaintiff returned to the Ottawa Hospital ER on June 5, 2006, with a cough and congestion, and requested a prescription for Albuterol. Dr. Andrew Harris found Plaintiff to be in a mild amount of distress, with no wheezing in her lungs or pain. He diagnosed acute bronchitis and instructed Plaintiff to follow-up with her doctor. (R. 203, 205.)

On August 16, 2006, Plaintiff sought treatment at the Health Center of Eastern LaSalle County ("LaSalle Health Center"). Dr. Anna Talarico noted that Plaintiff was emaciated, crying and concerned about having cancer in her chest. Plaintiff admitted to smoking a pack of cigarettes a day since she was 16 years old and complained of daily nausea and diarrhea. (R. 293.) Dr. Talarico diagnosed cough/COPD, nausea and a lung mass, and advised Plaintiff to "go through Cook County ER" for a PET scan. (R. 291, 293.)

Shortly thereafter, on August 21, 2006, Dr. C.J. Wonais performed a consultative examination of Plaintiff for the Bureau of Disability Determination Services ("DDS"). (R. 303-05.) Plaintiff told Dr. Wonais that she gets short of breath walking less than half a block, and that she "used to smoke 1 ½ to 2 packs per day." She complained of a chronic,

productive cough, weight loss, an enlarged liver, anxiety and "the start of cataracts" not requiring surgery. She also denied having diabetes and stated that she needed a PET scan but could not afford one without insurance. (R. 303-04.) Dr. Wonais found Plaintiff to have a normal mental status and gait, but diminished breath sounds and scattered wheezing. He diagnosed COPD, pulmonary mass, liver nodules, weight loss, anxiety, early cataracts and irregular heart rhythm. (R. 304.) Spirometry tests showed that before taking a bronchodilator, Plaintiff's FEV1 values were 1.5, 1.1 and 1.3. (R. 297-99.) After using an inhaler, Plaintiff's FEV1 values were 1.4, 1.3 and 1.4. (R. 300-02.)

On August 24, 2006, Dr. Virgilio Pilapil completed a Physical Residual Functional Capacity Assessment of Plaintiff for DDS. (R. 306-13.) He found that Plaintiff can occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for about 6 hours in an 8-hour workday, sit with normal breaks for about 6 hours in an 8-hour workday, and push and/or pull without limitation. (R. 307.) Dr. Pilapil imposed no postural, manipulative, visual or communicative limitations, but noted that Plaintiff must avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. (R. 308-10.) In Dr. Pilapil's view, Plaintiff is capable of performing light work. (R. 313.)

A little less than three months later, on November 15, 2006, Plaintiff went to the LaSalle Health Center complaining of frequent nausea, diarrhea and some chest discomfort. She reported smoking ½ a pack of cigarettes per day at that time. The doctor diagnosed probable COPD, lung mass, and possible gastroesophageal reflux disease ("GERD"), and ordered a chest CT scan. (R. 327.) Plaintiff appeared for the CT scan on November 30, 2006. The radiologist compared the test results with those from the March 14, 2006 scan, and concluded that there was "interval regression of the previously

described ill-defined soft tissue mass in the right upper lung." The doctor observed no change in the 15 millimeter right hilar lymph node, or in the multiple low density hepatic lesions. (R. 316.)

Also on November 30, 2006, Plaintiff took another spirometry test. She exhibited wheezing bilaterally, with a congested, non-productive cough. Prior to using a bronchodilator, Plaintiff's FEV1 value was 1.15. After taking a bronchodilator, her FEV1 value was 1.85. (R. 48, 318-19.) Plaintiff told the examiner that she was still smoking one pack of cigarettes a day. (R. 48, 318.) Treatment notes from the LaSalle Health Center dated December 21, 2006 are illegible, but Plaintiff returned on January 16, 2007, complaining of congestion and coughing. She claimed to have given up smoking and said she was producing yellow mucous and experiencing nausea. The doctor prescribed Advair, as well as Lexapro for anxiety/depression. (R. 326.) When Plaintiff went to the LaSalle Health Center again on February 8, 2007, she continued to complain of chest pain and said that she needed medication refills. (R. 326.) At a follow-up visit on March 22, 2007, Plaintiff reported that she still suffered from nausea and vomiting. (R. 325.)

On May 5, 2007, Plaintiff was admitted to the Ottawa Hospital due to intractable vomiting gastroenteritis. She admitted that she was still smoking, and reported that a chest x-ray showed scar tissue on her right lung and some benign cysts in her liver. An upper GI demonstrated "fairly marked amount of peptic acid disease, possible ulcer in the duodenum and slight reflux." Plaintiff received Zofran, Protonix and Tigan for nausea, and took a puff of Advair at bedtime. Dr. Michael Harney discharged Plaintiff on May 8, 2007, with instructions to take Prilosec OTC and Reglan, and to follow-up with her primary care physician. (R. 329-30.)

**B.     Plaintiff's Testimony**

In an August 5, 2006 Activities of Daily Living Questionnaire, Plaintiff stated that she's always out of breath, tired and weak.  She needs help "sometimes" with groceries, laundry and trash, and stairs wear her out.  (R. 146-47.)  According to Plaintiff, anything she does makes her tired, and she does not breathe well if it is hot.  (R. 147.)  She also has to "spit in a cup all day to release muc[o]us in [her] lungs."  (R. 148.)  In a Work History Report dated the same day, Plaintiff said that due to COPD and emphysema, she gets fatigued very easily, even if she is not doing anything.  She reported that she has trouble remembering where she puts things, and expressed concern about the mass on her lung and liver cysts.  (R. 157.)  Plaintiff completed another Activities of Daily Living Questionnaire on August 12, 2006, stating that she can cook, clean, vacuum, dust and do laundry.  She reported going grocery shopping three or four times per month, and indicated that she is able to care for her personal hygiene.  (R. 160-61.)  She also drives herself to visit friends and to run errands 10 times per month.  (R. 162.)  Plaintiff complained of forgetting things and coughing all night, and said that she is too tired to do anything but watch television and talk to neighbors.  (R. 161, 163.)

On December 8, 2006, Plaintiff completed a third Activities of Daily Living Questionnaire.  (R. 176-83.)  She stated that she "get[s] out of breath" after climbing 10 stairs and cannot walk far when shopping.  Laundry is "hard on me" and she's "usually exhausted by the time [she] get[s] done."  (R. 176-77.)  Plaintiff indicated that she needs to stay in the air conditioning during the summer, she gets fatigued and tired, and she suffers from nausea "all the time."  (R. 178.)  Plaintiff reported that she still cooks sometimes, she does laundry every two weeks, and she cleans, dusts and occasionally

goes grocery shopping. It is hard for her to shop at large stores, however, because she loses her breath just walking from the parking lot to the store entrance. (R. 179.) Plaintiff continued to complain of memory and concentration problems, and stated that she does not sleep well due to nausea, coughing and spitting up mucous. That said, she has many friends who visit her, and she is still able to drive, talk to neighbors, talk on the phone, do errands and pay bills/do finances. (R. 180-82.)

At the July 18, 2007 hearing, Plaintiff testified that she lives with her husband in the motel where he works. (R. 27-28.) She is able to drive and visits her girlfriend a couple times a week, but she mostly watches television. (R. 28, 34-35.) When she goes to the store, she gets out of breath and cannot stand in one spot for more than 10 minutes at a time without needing to kneel or bend over. (R. 33, 36, 40.) Plaintiff stated that her husband does the laundry and she is unable to vacuum, though she can pick up after herself and prepare meals with a hot plate and microwave. (R. 34, 35-36.) She explained that she is no longer able to work as a bartender or in a factory setting because she cannot be around dust or engage in heavy lifting. (R. 28-29.)

Plaintiff testified that she does not have any medical coverage, but she goes to a free clinic almost every month, as suggested by ER physicians. The Albuterol and Advair she gets from the free clinic keep her from having to go to the emergency room, but "everyone gives [her] samples" of medication, including "doctors in the emergency room at the hospital." (R. 28, 31, 37-38.) Plaintiff complained of nausea associated with acid reflux and stated that she is "starting to get cataracts." The reflux is controlled with medication, however, and Plaintiff has neither had cataract surgery nor exhibited any need to wear glasses except for reading purposes. She claimed to have "some sort of diabetes,"

but never took a test to confirm that diagnosis and was not on any related medication. (R. 30-31.)

Plaintiff stated that she has to sleep sitting up because her lungs fill up with fluids, and she wakes up to spit or vomit. (R. 34, 36-37.) She uses her Albuterol nebulizer a few times per week, especially when it is humid. (R. 35-36.) Plaintiff told the ALJ that she had stopped smoking six to eight months before the hearing, but also admitted that she had smoked a pack of cigarettes three weeks earlier after a friend died. (R. 27.)

## C. Vocational Expert Testimony

Mr. Jefferson testified at the hearing as a VE. He characterized Plaintiff's previous work as ranging from unskilled to skilled, and from light to medium. (R. 41.) The ALJ described a hypothetical person of Plaintiff's age, education and vocational background, who could: never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch and crawl; and never be exposed to fumes, odors, dust, dampness, upper respiratory irritants or poor ventilation. The VE testified that such an individual could not perform Plaintiff's past work, with the possible exception of industrial x-ray operator. (R. 41-42.) She could, however, work in a variety of other light, unskilled jobs available in Illinois, including cashier (40,585 jobs), computer viewer (4,123 jobs), receptionist/information clerk (3,453 jobs), courier/messenger (7,065 jobs), and general office clerk (7,929 jobs). She could also perform 8,000 general office clerk jobs at the light, semi-skilled level. (R. 42, 45.)

## D. The ALJ's Decision

ALJ Gildea found that Plaintiff's COPD and emphysema are severe impairments, but that her diabetes and cataracts are not severe. (R. 14.) The ALJ determined that

Plaintiff does not have an impairment or combination of impairments that meets or equals those listed in the Social Security Regulations, and concluded that she has the residual functional capacity ("RFC") to perform light work, including: occasionally lifting/carrying up to 20 pounds; frequently lifting/carrying less than 10 pounds; and standing/walking for up to 6 hours in an 8-hour workday. Plaintiff cannot climb ladders, ropes or scaffolds, or engage in work requiring concentrated exposure to fumes, odors, dust, gases or other respiratory irritants. She can, however, occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. 14-15.) With these limitations, the ALJ found that Plaintiff can work as a general office clerk, cashier, interviewer, receptionist/information clerk, or courier/messenger. (R. 20.)

In reaching this conclusion, the ALJ discussed in detail Plaintiff's medical history and agreed that her impairments could reasonably be expected to cause shortness of breath and chest pain. (R. 16-18.) The ALJ did not credit Plaintiff's allegations of totally disabling symptoms, however, noting that her daily activities include driving a car, preparing simple meals, talking with neighbors, talking on the telephone, going to the store, dusting, paying bills/doing finances, visiting friends and watching television. (R. 16-17.) The ALJ found it significant that: none of Plaintiff's treating physicians placed any restrictions on her activities aside from avoiding respiratory irritants and heavy lifting; the record reflects "significant gaps in [Plaintiff's] history of treatment"; and Plaintiff was not compliant in following medical advice or taking prescribed medications. (R. 17-18, 20.) The ALJ also remarked that Plaintiff continues to purchase cigarettes despite claiming that she lacks money for treatment. (R. 17.)

The ALJ agreed with the VE that Plaintiff cannot perform any past relevant work, but also accepted that there are approximately 8,000 semi-skilled and 63,155 unskilled jobs available to her within Illinois. (R. 19-20.) In the ALJ's view, there was no objective medical evidence to support Plaintiff's claim that she is limited to performing sedentary work, and she is not disabled within the meaning of the Act.

## DISCUSSION

**A.    Standard of Review**

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007) (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G.*

*v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002)).

## B.    Five-Step Inquiry

To recover DIB or SSI under Titles II and XVI of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act.[5]  *Keener v. Astrue*, No. 06-CV-0928-MJR, 2008 WL 687132, at *1 (S.D. Ill. Mar. 10, 2008); *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001).  A person is disabled if she is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  20 C.F.R. § 416.905.  In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?  (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work?  *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## C.    Analysis

In support of her motion for a reversal and/or remand of the ALJ's decision, Plaintiff argues that the ALJ erred in several respects.  The Court addresses each argument in turn.

---

[5]      The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq.*  The SSI regulations are virtually identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq.*

### 1.    Severity Assessment

Plaintiff first objects to the ALJ's conclusion that her diabetes and cataracts are not severe impairments under the Act.  A severe impairment is "an impairment or combination of impairments that 'significantly limits [one's] physical or mental ability to do basic work activities."  *Castile v. Astrue*, 617 F.3d 923, 2010 WL 3188930, at *2 (7th Cir. 2010) (quoting 20 C.F.R. § 404.1520(c)).  The Seventh Circuit recently explained that "[a]s long as the ALJ determines that the claimant has one severe impairment, the ALJ will proceed to the remaining steps of the evaluation process," making the step two determination of severity "merely a threshold requirement."  *Id.* (quoting *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999)).  Here, the ALJ found that Plaintiff's COPD and emphysema are severe impairments so proceeded with the five-step evaluation process.  Since the ALJ's finding with respect to Plaintiff's diabetes and cataracts did not prevent Plaintiff from satisfying the threshold requirement, there is no basis for overturning the ALJ's decision at step two based upon this alleged error.

In any event, substantial evidence supports the ALJ's conclusion that Plaintiff's cataracts and diabetes are not in fact severe impairments.  Plaintiff claims to have "the start of cataracts," and Dr. Wonais did diagnose "early cataracts" in August 2006.  Aside from one complaint about blurred/double vision lasting for one day in March 2005, however, there is no evidence that cataracts had any effect whatsoever on Plaintiff's daily life.  To the contrary, Plaintiff admitted that she merely wears glasses for reading purposes.  With respect to diabetes, Plaintiff told Dr. Bern on March 5, 2005 that she "possibly" has diabetes, but no physician ever made such a diagnosis, and the record contains no evidence that Plaintiff received any related medical treatment.  Plaintiff has not presented

any evidence that cataracts and/or diabetes limit her ability to do basic work activities in any respect, and the ALJ did not err in concluding that these impairments are not severe. *See Pound v. Astrue*, No. 08-cv-721-MJR-PMF, 2010 WL 746986, at *3 (S.D. Ill. Mar. 2, 2010) ("20 C.F.R. § 404.1521(a) provides that an impairment or combination of impairments is *not* severe 'if it does not significantly limit your physical or mental ability to do basic work activities.'") (emphasis in original).

Plaintiff also insists that the ALJ should have assessed the severity of her other medical impairments, including bigeminy, chronic bronchitis, depression, esophagitis, gastroenteritis, hypoxia, liver lesions, mass in upper lobe of right lung, neoplasm or scarring in lungs, pneumonia, pulmonary hilar lymph node and tachycardia. Once again, the severity assessment is merely a threshold inquiry, and the ALJ identified two other severe impairments before proceeding with the five-step analysis. Though the ALJ did not discuss all of Plaintiff's impairments at step two, he considered them at step four in determining her RFC to perform work activity. *See Boucek v. Astrue*, No. 08 C 5152, 2010 WL 2491362, at *5 (N.D. Ill. June 16, 2010) (no error where the ALJ did not discuss all impairments at step two, but did so at step four).

Moreover, Plaintiff has the burden of showing that her impairments are severe at step two of the analysis. *See Clifford*, 227 F.3d at 868. Plaintiff enumerates the additional impairments and stresses that they are "documented in the medical record." (Doc. 50, at 2.) Beyond that, however, Plaintiff points to no evidence to support a finding that the impairments are severe. None of the examining physicians indicated that Plaintiff experiences any ongoing limitations as a result of the conditions, or that they affect her ability to engage in basic work activities. The ALJ's step two severity assessment is

supported by substantial evidence and does not provide a basis for reversal or remand. *See, e.g., Morgan v. Astrue*, No. 07 C 1741, 2009 WL 650364, at *8 (N.D. Ill. Mar. 9, 2009), *vacated on other grounds*, 2010 WL 3452765 (7th Cir. Aug. 2, 2010) ("[W]e have found no case that has been remanded solely on the basis of a Step Two determination that was favorable to a claimant, but cursory.")

### 2. Listing 3.02A (Chronic Pulmonary Insufficiency)

Plaintiff next argues that the ALJ should have found that she meets Listing 3.02A for chronic pulmonary insufficiency. 20 C.F.R. Part 404, Subpt. P, Appx. 1, § 3.02A. To meet this Listing, Plaintiff must have COPD with an FEV1 value of 1.25 or less, based on her height. *Id.* Plaintiff's most recent spirometry test on November 30, 2006 produced the following FEV1 values: 1.15 before taking a bronchodilator, and 1.85 after taking a bronchodilator. (R. 48, 318.) Plaintiff insists that the ALJ was required to use the pre-bronchodilator FEV1 value of 1.15, which was low enough for her to meet Listing 3.02A. The regulations, however, say otherwise.

For purposes of § 3.02A, "[t]he highest values of the FEV1 . . . should be used to assess the severity of the respiratory impairment." 20 C.F.R. Part 404, Subpt. P, Appx. 1, § 3.00E. In addition, "[s]pirometry should be repeated after administration of an aerosolized bronchodilator," and "[p]ulmonary function studies performed to assess airflow obstruction without testing after bronchodilators cannot be used to assess levels of impairment in the range that prevents any gainful work activity, unless the use of bronchodilators is contraindicated." *Id.* Here, Plaintiff's FEV1 value after using a bronchodilator was 1.85, well above the maximum qualifying value set forth in Listing 3.02A. *See, e.g., Young v. Apfel*, No. 98 C 1058, 1999 WL 354776, at *4 (N.D. Ill. May 27,

1999) ("[A]n individual of [claimant's] height is disabled if his or her post-bronchodilator FEV1 is 1.25 . . . or less.")

Plaintiff disagrees, arguing that the ALJ was not qualified to determine whether a bronchodilator was in fact "indicated." (Doc. 50, at 4.) To the extent Plaintiff's physicians administered a bronchodilator during the course of the spirometry test, however, it was obviously indicated in this case. Plaintiff also observes that *Young*, as a district court decision, is not binding precedent, and contends that the judge in that case was not qualified to decide whether to use a pre- or post-bronchodilator FEV1 value. (*Id.* at 4-5.) Notably, Plaintiff cites to no contrary decisions, and *Young* is consistent with the applicable regulations. Plaintiff similarly fails to cite any competent medical authority demonstrating that her impairments include symptoms equal in severity to those described in Listing 3.02A. (Doc. 40-2, at 8 (citing 20 C.F.R. § 404.1526).) Nothing in the record supports such a finding. *See Ghys v. Commissioner of Social Sec.*, No. 09-cv-4034, 2010 WL 1996375, at *8 (C.D. Ill. May 19, 2010) ("[I]t is Plaintiff's burden to show that his impairment meets or equals the requirements of a Listing.")

Finally, Plaintiff makes much of the fact that the ALJ mistakenly described her post-bronchodilator FEV1 value as 2.63. (R. 15.) This is an error, but it is entirely harmless given that Plaintiff's actual FEV1 value in that regard was 1.85, well above the value necessary to place her within Listing 3.02A. *See Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir. 2003) ("[T]he doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions." ); *Scott v. Astrue*, __ F. Supp. 2d __, 2010 WL 3034668, at *18 (C.D. Ill. July 30, 2010) ("Harmless errors are those that do not affect the ALJ's

determination that a claimant is not entitled to benefits.") (internal quotations omitted). The ALJ's step three finding is supported by substantial evidence.

### 3. Plaintiff's Credibility

In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence. *See* SSR 96-7p, at 2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Id.* (quoting *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004)). *See also* 20 C.F.R. § 404.1529. The ALJ must provide specific reasons for the credibility finding, but hearing officers are in the best position to evaluate a witness's credibility and their assessment will be reversed only if "patently wrong." *Schmidt*, 496 F.3d at 843; *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

The ALJ found that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were "not entirely credible." (R. 16.) In reaching this conclusion, the ALJ discussed the medical evidence in detail, as well as Plaintiff's own statements regarding her limitations. The ALJ noted, for example, that Plaintiff experiences shortness of breath and chest pain, she "is winded walking across the Wal-Mart parking lot," she has to sleep sitting up because her lungs fill with fluids, she can only stand for 10 minutes, and she cannot handle being around respiratory irritants. (*Id.*) The ALJ also noted, however, that Plaintiff's self-described activities, as set forth in Activities of Daily

Living Questionnaires and hearing testimony, include driving a car, preparing simple meals, talking with neighbors, talking on the telephone, going to the store, doing laundry, cleaning the house, dusting, paying bills/doing finances, visiting friends, and watching television. (R. 15-16, 160-63, 180-81.)

The ALJ acknowledged Plaintiff's hearing testimony that she does not in fact clean or do laundry, but stated that if her symptoms truly are disabling, "one might expect to see some indication in the treatment records of restrictions placed on the claimant by the treating doctor." (R. 17.) Plaintiff objects that this is "purely speculative," and suggests that "[p]erhaps the treating doctor believed that claimant's condition would self-restrict her activities." (Doc. 40-2, at 8.) The ALJ's phraseology is somewhat inartful, but Plaintiff's allegations of disabling symptoms are inconsistent with the medical evidence of record. In May 2005, Dr. Brauweiler stated that Plaintiff could work as long as she was not around smoke or required to lift more than 20 pounds. (R. 242.) Dr. Pilapil confirmed that assessment in August 2006, finding Plaintiff capable of performing light work if she avoids concentrated exposure to fumes, odors, dusts, gases and poor ventilation. (R. 310.) No other physician placed any additional restrictions on Plaintiff's activities that would support her claim that her symptoms render her completely unable to work. *See, e.g., Sienkiewicz v. Barnhart*, 409 F.3d 798, 803 (7th Cir. 2005) (affirming credibility determination where the claimant's complaints were inconsistent with the medical findings that she had only minimal or moderate limitations, and "no doctor ever suggested that any greater limitation was required.")

The ALJ also discounted Plaintiff's credibility based on the significant gaps in her history of treatment, and the fact that she was not entirely compliant in taking prescribed

medications. "[I]nfrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment." *Craft*, 539 F.3d at 679 (quoting SSR 96-7p). At the same time, an ALJ "'must not draw any inferences' about a claimant's condition from this failure [to seek treatment] unless the ALJ has explored the claimant's explanations as to the lack of medical care." *Id.*

The ALJ cited evidence that Plaintiff has no medical insurance and has trouble affording treatment and medication. He also noted, however, that Plaintiff was encouraged to go to a free clinic for follow-up care and samples. (R. 17.) Dr. Janota referred Plaintiff to social services in January 2006, Dr. Grueskin "strongly encouraged" Plaintiff to follow-up with the free clinic in March 2006, Plaintiff met with Shirley Goodwin from social services in May 2006, and Dr. Talarico advised Plaintiff to obtain a PET scan through the Cook County ER in August 2006. (R. 214, 229, 257.) In addition, Plaintiff testified that she goes to a free clinic almost every month and obtains free samples from both the clinic and ER doctors. (R. 31, 37.) Nevertheless, there is evidence that Plaintiff did not take her medication on a consistent basis and went for months at a time without seeking medical care. *Cf.* SSR 96-7p (an explanation for not seeking medical care may include that the claimant does not have "access to free or low-cost medical services.")

Plaintiff objects that the ALJ improperly discounted her testimony regarding financial difficulties based on her ability to continue purchasing cigarettes. The ALJ first expressed doubt regarding Plaintiff's claim that she cannot handle being around respiratory irritants when she continues to smoke. (R. 16.) The Court finds the ALJ's suspicion in this regard entirely reasonable. The ALJ also noted that on March 8, 2006, Plaintiff claimed that she

22

could not afford medication yet admitted that she continued to purchase cigarettes. (R. 17.) This observation is consistent with the medical records, all of which show that Plaintiff regularly bought and smoked cigarettes over a period of years despite being repeatedly warned to stop. (R. 259, 264, 272.) Plaintiff acknowledges that "it may not be to her best advantage to continue to smoke," but insists that there is no evidence that if she did stop, her impairments would be rendered non-severe. (Doc. 40-2, at 9.) Perhaps, but Plaintiff's willingness and ability to continue smoking fairly undermines her claim of disabling breathing problems. On the facts presented, the Court cannot say that the ALJ's credibility determination is patently wrong.

### 4.    RFC Determination

Plaintiff argues that the ALJ's decision must nonetheless be reversed and/or remanded because he ignored certain evidence in making an RFC assessment. In Plaintiff's view, the ALJ failed to discuss her November 30, 2006 spirometry test, or to mention evidence of depression and sinus tachycardia. (Doc. 40-2, at 10.) Plaintiff also contends that the ALJ failed to perform a function-by-function assessment of her capacity to engage in work activity as required by SSR 96-8p. (*Id.* at 11.) An ALJ "must consider all of the relevant evidence of record, and may not selectively pick through medical reports to support h[is] conclusion while ignoring relevant conflicting evidence." *Hurley v. Astrue*, __ F. Supp. 2d __, 2010 WL 1996598, at *9 (N.D. Ill. May 19, 2010) (citing *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009)). That said, "the ALJ is not required to address every piece of evidence or testimony presented." *Id.* (quoting *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009)).

In this case, the ALJ clearly considered the November 30, 2006 spirometry results, which he mentioned in connection with his step three analysis. (R. 15.) The ALJ also noted Plaintiff's diagnosis of depression in January 2006, and her various heart issues such as chronic bigeminy and "irregular heart rhythm." (R. 17, 18.) In fact, the ALJ discussed all significant medical records and conditions, including pneumonia, a mass in the right upper lung representing either primary neoplasm or scarring, reflux esophagitis and gastroenteritis, acute bronchitis, liver nodules, shortness of breath, anxiety, actelectasis and early cataracts. (*Id.*) Contrary to Plaintiff's assertion, the ALJ's opinion "reflects a comprehensive review of the evidence such that [he] has built a 'logical bridge' from evidence to conclusion." *Hurley*, 2010 WL 1996598, at *9.

Moreover, in making the RFC determination, the ALJ followed the recommendations set forth by Dr. Brauweiler and Dr. Pilapil, neither of which finds contradiction in the record. "Where the ALJ does not reject countervailing evidence, he need not articulate his reasons for accepting the medical opinions in the record." *Hoy v. Astrue*, No. 08 C 4617, 2009 WL 4679746, at *9 (N.D. Ill. Dec. 7, 2009), *aff'd*, 2010 WL 3190701 (7th Cir. Aug. 12, 2010) (quoting *Fischer v. Barnhart*, 129 Fed. Appx. 297, 303 (7th Cir. 2005)). The ALJ reasonably accepted Dr. Pilapil's opinion that Plaintiff can occasionally lift/carry up to 20 pounds, frequently lift/carry less than 10 pounds, and stand and/or walk for up to 6 hours in an 8-hour workday. The ALJ confirmed that Plaintiff must avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation, and further accommodated her respiratory conditions by finding that she can never climb ladders, ropes or scaffolds, and can only occasionally climb ramps and stairs, balance, kneel, crouch and crawl. (R. 15,

307-10.)  No physician of record imposed any greater restrictions on Plaintiff than those identified by the ALJ.  The ALJ's RFC determination is supported by substantial evidence.

### 5.    VE Testimony

Plaintiff finally objects that the ALJ made several errors with respect to the VE's testimony.  She first claims that the ALJ failed to determine whether the VE had read the medical record.  This is incorrect.  The VE was present throughout the hearing, and the ALJ expressly asked him whether he had reviewed the file exhibits.  (R. 41.)  *See David v. Barnhart*, 446 F. Supp. 2d 860, 878 (N.D. Ill. 2006) (where the VE had an opportunity to review the record and was present at the hearing, the ALJ could "impute knowledge to the VE of everything in the exhibits and testimony.")  Plaintiff next argues that the ALJ did not "allow the VE to respond with any of his own individual concerns based upon the claimant's conditions." (Doc. 40-2, at 12.)  It is not entirely clear what Plaintiff means by this objection, and she does not direct the Court to any supporting case or other authority.  Regardless, there is no evidence that the VE was unable to make his opinions known, and Plaintiff's attorney had an opportunity to question the VE at the hearing and elicit any additional, pertinent testimony.  (R. 46.)  *See Moore v. Commissioner of Social Sec.*, No. 08-cv-2018, 2009 WL 500732, at *8 (C.D. Ill. Feb. 27, 2009) (quoting *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir. 1988)) ("The ALJ is entitled to presume that a claimant represented by counsel in the administrative hearings has made his best case.")

In a final effort to overturn the ALJ's decision, Plaintiff claims that the hypothetical question to the VE failed to account for all of her medical conditions.  "[A]n ALJ's hypothetical questions to a VE 'must include all limitations supported by medical evidence in the record.'"  *Simila*, 573 F.3d at 520 (quoting *Steele*, 290 F.3d at 942).  However, "the

ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible." *Id.* (quoting *Schmidt*, 496 F.3d at 846). The hypothetical questions in this case were based on the reasonable RFC, and were fully consistent with the medical evidence, including the opinions of every treating and consulting physician. The ALJ did not err with respect to the VE testimony, and his conclusion that Plaintiff is capable of performing a significant number of light jobs available in Illinois is supported by substantial evidence.

## **CONCLUSION**

For the reasons stated above, Defendant's Motion for Summary Judgment [Doc. 44] is granted, and Plaintiff's Motion for Summary Judgment [Doc. 40, 53] is denied. The Clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated: November 1, 2010

SHEILA FINNEGAN
United States Magistrate Judge